Andrew M. Hutchison (SBN 289315)
COZEN O'CONNOR
101 Montgomery Street, Suite 1400
San Francisco, CA 94104
Tel.:    (415) 593-9625
Fax:    (415) 692-3514
Email:   ahutchison@cozen.com

*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERRY GARRETT, an individual, as Special Administrator for the ESTATE OF FRANK GARRETT, JR., <br><br> *Plaintiff,* <br><br> v. <br><br> ITM TWENTYFIRST, LLC; JOHN DOES 1-5; and ABC CORPORATIONS 1-5. <br><br> *Defendants.* | Case No. <br><br> **COMPLAINT FOR:** <br><br> RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE INTEREST <br><br> **DEMAND FOR JURY TRIAL** |

## COMPLAINT

Jerry Garrett, as the Special Administrator for the Estate of Frank Garrett, Jr. (the "Estate"), by and through his undersigned counsel, hereby files and submits this Complaint against Defendants, ITM TwentyFirst, LLC ("ITM"), John Does 1-5, and ABC Corporations 1-5 (collectively, "Defendants"), and in support thereof, alleges and says:

## PARTIES

1. Jerry Garrett, a resident and citizen of California, brings this action on behalf of the Estate of his father, Frank Garrett, Jr.

2. Frank Garrett was at all times relevant to this Complaint a citizen and resident of California. Frank Garrett died a citizen and resident of Menlo Park, San

Mateo County, California, and thus the Estate is considered a citizen of San Mateo County, California.

3. Frank Garrett died testate. His Will names his wife, Jean L.Y. Garrett, as Executrix. Jerry Garrett brings this action at the request of Jean L.Y. Garrett and pursuant to a petition to be filed by Jean L.Y. Garrett in San Mateo County, California, for Jerry Garrett's appointment as Special Administrator.

4. ITM is a limited liability company with a single member, Longevity Holdings, Inc. ("Longevity"). Longevity is a corporation organized under Delaware law with its principal place of business in Minnesota. An LLC is deemed a citizen of each state in which its members reside. Therefore, ITM is a citizen of both Delaware and Minnesota.

5. If and to the extent that ITM did not act solely on its own behalf to obtain and retain for itself the death benefit proceeds of one or more life insurance policies insuring the life of Frank Garrett, upon information and belief, ITM was retained by investor or investors John Does 1-5 and/or ABC Corps. 1-5 ("Investor Defendants"), to act as the agent of one or more of the Investor Defendants in connection with such policies. The Estate currently lacks information sufficient to form a belief as to the location, organization, residency, or citizenship or any of the Investor Defendants.

## JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Estate, a citizen of California, and ITM, a citizen of Minnesota and Delaware, and because the amount in controversy exceeds $75,000 exclusive of interest and costs.

7. This Court possesses personal jurisdiction with respect to ITM in this action because, among other things, ITM had extensive contact with the forum that relates to the core subject-matter of this action, including action within the forum to monitor, service, maintain, and collect or assist in collecting on one or more life

1  insurance policies that insured the life of a California resident (the now deceased
2  Frank Garrett).

3      8.    For example, upon information and belief, while Frank Garrett was
4  living, ITM maintained regular contact with him and his family in California to
5  monitor his health.  This was done by way of routine phone calls and mail.

6      9.    Further, upon information and belief, while Frank Garrett was living,
7  ITM obtained a HIPAA release from him in California and used that release to contact
8  his medical providers in California and to obtain his medical records from those
9  California providers.  The purpose of collecting such records was so that ITM could
10 conduct a life expectancy analysis on Frank Garrett, a California resident, to predict
11 when he would die and when they could expect to collect money from his death.

12     10.    After Frank Garrett passed away, ITM communicated with his family
13 seeking their assistance in obtaining a copy of his death certificate from Santa Clara
14 County, California.  ITM or their agent(s) then requested and received Mr. Garrett's
15 death certificate from officials in Santa Clara County, California.

16     11.    Upon information and belief, ITM thereafter used that California death
17 certificate to collect the death benefit proceeds from the policies on the life of Frank
18 Garrett, a resident of California.  Upon information and belief, ITM also carried on
19 extensive business in the forum with respect to other insureds.

20     12.    Upon information and belief, one or more of the Investor Defendants
21 was/were the owner and/or ultimate beneficiary of one or both of the life insurance
22 policies insuring the life of Frank Garrett.  Upon information and belief, the Investor
23 Defendant(s) is/are the owner(s) and/or ultimate beneficiary/ies of other life insurance
24 policies insuring the lives of residents of California.  Upon information and belief,
25 working through servicers, including ITM, the Investor Defendant(s) direct(s) ITM as
26 agent to (a) regularly and systematically contact Californians to monitor their health;
27 (b) obtain HIPAA releases from Californians and use those releases to obtain their
28 medical records from providers throughout the state; and (c) regularly obtain death

certificates from counties throughout the state and uses those death certificates to make or assist in making claims for the death benefits of life insurance policies on the lives of Californians.

13. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred within the Northern District of California. In addition to the allegations above, this cause of action arose within the forum and relates to life insurance policies that insured the life of Frank Garrett, who was at all relevant times a resident of San Mateo or Santa Clara Counties, California, both of which are within this judicial district. Moreover, the Estate is located in and is a citizen of the district in which this forum is situated. Relevant witnesses and sources of information and documents relating to the application for the policies and their issuance are believed to be located within this forum. Additionally, upon information and belief, witnesses, documents and sources of information relating to ITM's efforts, acting on its own behalf or as the agent of one or more of the Investor Defendants, to obtain and use the California death certificate for Frank Garrett are believed to be located within this forum.

## **FACTS COMMON TO ALL CLAIMS**

14. This action concerns two life insurance policies issued on the life of Frank Garrett (collectively, the "Policies").

15. The first policy was issued by PHL Variable Insurance Company ("PHL") on February 7, 2006 (the "Delaware Policy"). The Delaware Policy was issued to the Frank Garrett, Jr. 2006 Insurance Trust (the "Delaware Trust"), a Delaware statutory trust.

16. The second policy was issued by Massachusetts Mutual Life Insurance Company ("Mass Mutual") on February 14, 2006 (the "South Dakota Policy"). The South Dakota Policy was issued to the Frank Garrett Jr. 2006 Irrevocable Trust (the "South Dakota Trust"), a South Dakota statutory trust.

## The Delaware Policy

17. The Delaware Policy is controlled by and subject to Delaware law, including because, upon information and belief, the policy was applied for, issued, and delivered in Delaware to a Delaware statutory trust in Delaware, and thus was a Delaware trust owned policy as defined in Delaware's insurable interest statute, 18 *Del. C.* § 2704.

18. As stated by the Supreme Court of Delaware, it is well recognized that, "[s]ince the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*"). Insurance policies which are procured as a wager on the life of the person insured not only violate Delaware public policy and its constitutional prohibition on wagering, but they also violate the state's insurable interest requirement, which precludes investors from manufacturing life insurance policies for the purpose of resale. *Id*.

19. Although human life speculators have been a problem for hundreds of years, never has this problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were effectively securitized and sold to other investors.

20. It is well established, however, that in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe*, 28 A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies." *Id*. These policies are often referred to as STOLI—meaning stranger originated life insurance. *Id*.

21. One such STOLI promoter was family of interrelated Delaware entities known generally as Coventry, which operated an extremely large Delaware-centered STOLI program that generated thousands of STOLI policies on the lives of senior citizens from all over the United States.

22. Entities such as Coventry—known in the STOLI industry as "funders"—worked with a nationwide network of insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior citizens meeting the funders' investment criteria and influencing those seniors to become involved in the STOLI transactions the funders were orchestrating.

23. The STOLI transactions orchestrated by funders like Coventry and its agents were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety as being a "risk-free" opportunity, "just a good deal," or as being similar to "hitting the lottery" or acquiring a winning "bingo" card.

24. The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities including that the policies at issue were procured by third parties that lacked an insurable interest in the insureds and that sought to wager on the life of the insureds.

25. It is widely recognized that one of the most common STOLI schemes involved the use of two-year, non-recourse premium financing. Under this type of STOLI scheme, a trust is typically created in the insured's name to serve as the nominal owner of the policy and to enter into a two-year loan where the only collateral is the policy itself, which is assigned as such to the STOLI lender. The loan is designed to coincide with the policy's two-year contestable period, and the policy is sold to an investor after that period has expired.

26. The Delaware Supreme Court in *Price Dawe* recognized that policies created using this same type of two-year non-recourse premium finance scheme—which is what Coventry orchestrated here with regard to the Delaware Policy—are

STOLI and thus void *ab initio*. *See Price Dawe*, 28 A.3d at 1070-71, n.27 (citing Martin, *Betting on the Lives of Strangers*, 134 U. Pa. J. Bus. L. at 175 (STOLI exists where a trust is used to own the policy and the interests in the trust are transferred to an investor at the end of a two-year loan)); *id.* at n.32 (citing *Spin-Life Insurance Policies: A Dizzying Effect on Human Dignity and the Death of Life Insurance*, 7 Ave Maria L. Rev. 605, 606, 622-24 (2009) (STOLI includes two-year loans where "the loan amount, interest, and fees imposed by the investors are high enough that the applicant is forced to accept the offers made by the investors and transfer ownership of the policy")).

27. Since at least 1914, Delaware law has followed the United States Supreme Court's decision in *Warnock v. Davis*, 104 U.S. 775 (1881). *See Balt. Life Ins. Co. v. Floyd*, 28 Del. 201, 207, 91 A. 653, 656 (Del. 1914) ("Where a third party, without any insurable interest in the life of another, procures a policy of insurance on the life of such person, either by having a policy issued directly to himself, or by having the person whose life is insured take out a policy to himself, and then assign it, these facts, as is held in *Warnock v. Davis* [104 U.S. 775, 26 L. Ed. 924], conclusively show that the transaction is a mere speculation on the life of another, and as such is contrary to public policy, and therefore void.").

28. Although dating back to 1881, *Warnock* involved a stranger-originated, premium-financed life insurance policy where an insured was induced to apply for a policy that was paid for by an entity known as the Scioto Trust Association. In exchange, the trust promised that when the insured died, one tenth of the policy's death benefit would be paid to his wife (with the rest going to the trust). After the insured passed and the insurer paid the policy's death benefit, the insured's estate sued the trust and the Court held that the policy was a mere wager on the life of the insured. The Court thus awarded the STOLI proceeds to the insured's estate. 104 U.S. 775.

29. Not surprisingly, therefore, every court that has considered Coventry's two-year, non-recourse premium finance scheme under Delaware law has held, as a

matter of law, that: (i) Coventry operated a STOLI program, and (ii) policies produced by that program are void *ab initio*. *See, e.g., Sun Life v. U.S. Bank*, No. 14-CIV-62610, 2016 WL 161598, at *10-13 (S.D. Fla. Jan. 14, 2016) ("*Malkin*"), *aff'd*, 693 F. App'x 838 (11th Cir. June 12, 2017); *U.S. Bank v. Sun Life*, No. 14-4703, 2016 WL 8116141, at *12-14 (E.D.N.Y. Aug. 30, 2016) ("*Van de Wetering*"), *adopted in full*, 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017); *Sun Life v. U.S. Bank*, 369 F. Supp. 3d 601, 609 (D. Del. 2019) ("*Sol*").

30.     And where, as here, an insurer pays the proceeds on a contract that lacked insurable interest, the policy proceeds must be paid over to the insured's estate under Delaware's common law and its insurable interest statute, 18 *Del. C.* § 2704(b). *See Estate of Malkin v. Wells Fargo Bank, N.A.*, 379 F. Supp. 3d 1263, 1284 (S.D. Fla. 2019) ("*Malkin II*"); *Lavastone Capital LLC v. Estate of Berland*, —A.3d—, No. 75-2021, 2021 WL 5316071, at *5-8 (Del. Nov. 16, 2021) ("*Berland*").

31.     The New Jersey Supreme Court also recently followed Delaware's lead, explaining that STOLI policies violate insurable interest laws, and specifically explaining that two-year, non-recourse STOLI schemes are a common way in which STOLI policies were created. *See Sun Life Assur. Co. of Canada v. Wells Fargo Bank, N.A.*, 238 N.J. 157, 171-72 (N.J. Sup. Ct. 2019) ("*Bergman*") ("Generally, an investor funds a STOLI policy from the outset, which makes it possible to obtain a policy with a high face value. The investor may lend the insured 'the money to pay the premiums for' the period of incontestability, typically two years. It is also common for an insured to buy the policy in the name of a trust and name a 'spouse or other loved one as the trust beneficiary.' In such arrangements, [i]f the insured dies within [the contestability] period, his spouse, as beneficiary of the insurance trust, will get the death benefit (the free insurance), pay back the loan plus interest from the proceeds, and often pay the broker up to fifty percent of the benefit received. If the insured lives beyond two years or the contestability period, then the life settlement company buys the beneficial interest in the insurance trust, paying the insured a lump sum percent of

the face value of the policy . . . . The life settlement company or its investors will continue to pay the premiums on the policy, and when the insured dies, they will get the death benefit. Clearly, the sooner the insured dies, the greater the company's profit. STOLI arrangements thus present a significant legal problem: the investors have 'no insurable interest in the life of the insured.' As a result, the transactions pose questions in light of New Jersey's policy against wagering.") (citing Martin, *Betting on the Lives of Strangers*, 13 U. Pa. J. Bus. L. at 188).

32. Likewise, state insurance departments have long recognized that such two-year, non-recourse loan schemes are STOLI. *See, e.g.*, Fla. Office of Ins. Reg., *Secondary Life Ins. Market Report to the Fla. Legis.*, at 11-12 (Dec. 2013), *available at* https://www.floir.com/siteDocuments/SecondaryLifeInsMarketReport2013.pdf ("In a typical STOLI transaction, the promoters and investors may establish an irrevocable trust, obtain an insurance policy on a senior, obtain a premium-finance loan, and pay the life insurance policy premiums for two years (*i.e.*, the contestable period). The money needed to pay these premiums, which can be substantial, is financed through premium-finance lenders. Typically, these premium-finance loans are non-recourse loans, meaning that the life insurance policy is the only collateral for the loan and the premium-finance lender can pursue only the collection of the collateral if there is a default.").

33. And as to Coventry specifically, it has been determined that Coventry did not act in "good faith" when it procured policies using its two-year, non-recourse premium finance program. *See Sol*, 369 F. Supp. 3d at 614 ("On the record before the Court, taking the evidence in the light most favorable to Defendant, a reasonable factfinder could only find that the third parties – Coventry, LaSalle, and/or SFG – did not act in good faith;" explaining "[t]his conclusion is based on at least the following, none of which (on the record before the Court) is in genuine dispute: (1) Sol's application contained material misrepresentations as to her finances and who would be paying the premiums; (2) all of the third parties failed to perform adequate due

diligence of (and may have willfully ignored) Sol's finances; (3) Coventry sought its own pre-application independent life-expectancy report of Sol; (4) the premium finance loan was non-recourse; (5) Sol and the Trusts lacked the practical ability to pay the premiums or repay the loan using anything but the proceeds from the Policy; (6) Coventry secured an irrevocable appointment of power of attorney over any life insurance policy owned by the Trusts, and to originate other policies in Sol's name; and (7) the entire arrangement presented a win-win situation for Coventry and its lending associates, as discussed in further detail below.").

34. Moreover, Coventry has been investigated by state insurance commissioners, which have made findings in connection with Coventry's alleged fraudulent activities in the business of life insurance. *See* Testimony of Mary Beth Senkewicz, Deputy Insurance Commissioner, Fla. Office of Ins. Regulation, at 9-11 (Apr. 29, 2009), available at https://tinyurl.com/3eya5fxp (summarizing investigations by the insurance departments of New York and Florida into fraudulent activities by Coventry, noting that Coventry agreed to pay a $1.5 million fine in connection with Florida's investigation).

35. After analyzing the Coventry Program, the Delaware Supreme Court recently reaffirmed an estate's right to recover death benefit proceeds where the policy was used as a mere cover for a wager. *See Berland*, 2021 WL 5316071, at *5-8 (holding that a policy procured through premium financing is void where "a third party, and not the insured, bears the entire financial liability for obtaining the policy" or where a "the trust [which owned the policy] is created through nominal funding as a mere formality," and that a policy is only valid if "the insured or his or her trust procured or effected the policy in good faith, for a lawful insurance purpose, and not as a cover for wagering contract," otherwise an estate may recover the death benefit proceeds because "the General Assembly has prescribed that the estate should receive the proceeds of [a STOLI] policy as a matter of public policy" and "equitable principles do not apply" such claims).

9

36. The Delaware Policy was procured through the Coventry Program.

37. In 2006, Coventry procured the Delaware Policy insuring the life of Frank Garrett, not for the benefit of him or his family but rather for itself and/or other stranger investors.

38. This was done using Coventry's two-year, non-recourse premium finance STOLI scheme, and the transaction at issue here is a mirror image of the unlawful STOLI transactions created and consummated by Coventry in *Berland*, *Malkin*, *Malkin II*, *Van de Wetering*, and *Sol*.

39. To induce Frank Garrett to allow the Policy to be procured on his life, Coventry and those acting on its behalf may have represented that the Policy was being procured through a legitimate and legal transaction, or further induced Frank Garrett with the promise of financial compensation if he permitted the Policy to be procured.

40. In reality, however, Coventry procured the Policy through an illegal STOLI scheme and Coventry lacked a valid insurable interest in the life of Frank Garrett.

41. Coventry accomplished this by causing an application (the "Delaware Application") for the Policy submitted to PHL, which ultimately issued the Policy as a Delaware life insurance policy.

42. Before causing the Delaware Application to be submitted to PHL, however, Coventry: (i) obtained a HIPAA release from Frank Garrett and used that release to collect his medical records and to prepare a life expectancy report to predict how long he might live, and thus how valuable the Policy might be for Coventry; and (ii) obtained a broad irrevocable power of attorney over Frank Garrett and any policy on his life, which permitted Coventry to originate policies on him.

43. Coventry then caused the creation of two Delaware statutory trusts in Frank Garrett's name, using Coventry's boilerplate, non-negotiable trust documents which were identical in all material respects to the Coventry trust documents used in

*Berland*, *Malkin*, *Malkin II*, *Van de Wetering*, and *Sol*—and in countless other STOLI transactions orchestrated by Coventry in and under Delaware law.

44. Those trust documents formed the Delaware Trust, whose purpose was to serve as the owner and beneficiary of the Policy.

45. Coventry also created a sub-trust to the Delaware Trust (the "Sub-Trust"), whose purpose was to serve Coventry and to become the named borrower under Coventry's non-recourse premium finance program.

46. Coventry installed its go-to trustee, Wilmington Trust Company ("Wilmington Trust"), as the trustee of the Delaware Trust and the Sub-Trust, and used both trusts as covers to procure the Policy without a valid insurable interest.

47. Upon information and belief, however, Wilmington Trust never met or spoke with Frank Garrett, was not paid by him, and was acting solely at the direction of and for the benefit of Coventry.

48. At Coventry's direction, the Sub-Trust, acting through Wilmington Trust, entered into an approximately 26-month non-recourse "loan" administered by Coventry, with the Policy serving as the sole collateral for the purported "loan."

49. As a result of this purported "loan," neither Frank Garrett nor anyone with an insurable interest in his life ever paid any premiums on the Policy. Rather, the "loan" was used to conceal the fact that such premiums were paid by Coventry for the purpose of creating a wager on Frank Garrett's life.

50. Coventry controlled and directed the entire transaction—which followed Coventry's standard STOLI scheme—and Coventry and its cohorts used Frank Garrett as an instrumentality to procure the Policy so that strangers with no insurable interest could wager on his early demise.

51. Upon information and belief, once the purported "loan" became due, stranger investors unrelated to Frank Garrett took formal control of the Policy.

**The South Dakota Policy**

52. South Dakota, like Delaware, has long forbid STOLI policies.

53. Section 58-10-5 of South Dakota's Codified Laws was enacted in 1991, and entitles an insured's estate to recover policy proceeds on any policy where an insurer pays the proceeds on a contract that lacked insurable interest under South Dakota's insurable interest statute. S.D.C.L. § 58-10-5.

54. Upon information and belief, an entity known as United National Funding, LLC ("United") ran a two-year, non-recourse premium financing STOLI scheme (the "United Program") similar to the Coventry Program.

55. In 2006, United procured the South Dakota Policy insuring the life of Frank Garrett—not for the benefit of him or his family—but rather for itself and/or other stranger investors.

56. This was done using United's two-year, non-recourse premium finance STOLI scheme.

57. Upon information and belief, to induce Frank Garrett to allow the Policy to be procured on his life, United and those acting on its behalf represented that the Policy was being procured through a legitimate and legal transaction, or further induced Frank Garrett with the promise of financial compensation if he permitted the Policy to be procured.

58. In reality, however, United procured the Policy through an illegal STOLI scheme and United lacked a valid insurable interest in the life of Frank Garrett.

59. United accomplished this by causing an application (the "South Dakota Application") for the Policy submitted to Mass Mutual, which ultimately issued the Policy as a South Dakota life insurance policy.

60. Before causing the South Dakota Application to be submitted to Mass Mutual, however, United obtained a HIPAA release from Frank Garrett and used that release to collect his medical records and to prepare a life expectancy report to predict how long he might live, and thus how valuable the Policy might be for United.

61. United then caused the creation of the South Dakota Trust for the purpose of serving as the owner and beneficiary of the Policy.

62. Upon information and belief, United installed its trustee, Bank of Sioux Falls ("First National"), as the trustee of the South Dakota Trust, and used the South Dakota Trust as a cover to procure the Policy without a valid insurable interest.

63. Upon information and belief, however, First National never met or spoke with Frank Garrett, was not paid by him, and was acting solely at the direction of and for the benefit of United.

64. Upon information and belief, at United's direction, the South Dakota Trust, acting through First National, entered into an approximately two year non-recourse "loan" administered by United, with the Policy serving as the sole collateral for the purported "loan."

65. Upon information and belief, as a result of this purported "loan," neither Frank Garrett nor anyone with an insurable interest in his life ever paid any premiums on the Policy. Rather, the "loan" was used to conceal the fact that such premiums were paid by United for the purpose of creating a wager on Frank Garrett's life.

66. Upon information and belief, United controlled and directed the entire transaction and, together with its cohorts, used Frank Garrett as an instrumentality to procure the Policy so that strangers with no insurable interest could wager on his early demise.

67. Once the purported "loan" became due, a little more than two years after the South Dakota Policy was in force, United's successor-in-interest, New Stream Insurance, LLC ("New Stream"), took formal control of the South Dakota Policy.

**Frank Garrett's Death and the Death Benefits**

68. On January 18, 2019, Frank Garrett died.

69. Upon learning of Frank Garrett's death, ITM and one or more of the Investor Defendants reached into this forum to obtain a copy of Frank Garrett's Santa

Clara County death certificate so that it could be submitted to claim the Policies' death benefit proceeds.

70. Upon information and belief, without notifying the Estate or the family of Frank Garrett, a claim for the Policies' death benefits were made by Defendants, and the death benefits were then paid by the insurance carriers to Defendants, their agent(s), their principal(s), or those working in concert with them.

71. Upon information and belief, Defendants were aware—or willfully ignorant of the fact—that the Policies' were procured or caused to be procured through a STOLI scheme, that they were illegal human-life wagers, and that they lacked insurable interest at inception.

72. The Policies' death benefit proceeds are believed to exceed $20 million.

**FIRST CAUSE OF ACTION: RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE INTEREST (DELAWARE POLICY)**

73. The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

74. The Delaware Policy is controlled by and subject to Delaware law, including because the Delaware Policy was applied for and delivered to the trustee of the Delaware Trust in Delaware, and is thus a Delaware trust owned policy as defined in Delaware's insurable interest statute, 18 *Del. C.* § 2704.

75. The Delaware insurable interest statute provides, among other things, that "no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured." 18 *Del. C.* § 2704.

76. The Delaware Supreme Court has clarified that this insurable interest requirement is not satisfied where a third party without an insurable interest uses an

insured as an instrumentality to procure a policy for itself as a wager on the insured's life. *Price Dawe*, 28 A.3d 1059.

77. Where an insurance company pays the death benefit on a policy lacking insurable interest, the "executor or administrator" of the insured is entitled to recover such benefits from the beneficiary, assignee, or payee that received the benefits as a matter of common law and statute. 18 *Del. C.* § 2704 (b). *See, e.g.*, *Berland*, 2021 WL 5316071, at *5-8; *Malkin II*, 379 F. Supp. 3d at 1284.

78. The Delaware Policy at issue in this case was procured or caused to be procured without insurable interest as a wager on Frank Garrett's life using Coventry's standard Delaware-centered STOLI scheme.

79. Regardless of whether Frank Garrett knew the details of this scheme or his identity was merely used as an instrumentality to procure the Delaware Policy, as set forth above, stranger investors were wagering on the life of Frank Garrett and hoping to trigger a secondary market cash-in on the Delaware Policy's death benefit.

80. The Delaware Policy's death benefit was paid, transferred, or otherwise assigned to Defendants, their principals or agents, or others working in concert with them.

81. As a consequence, the Estate is entitled to recover the Delaware Policy's death benefit proceeds, which are believed to exceed $10 million (plus applicable interest, attorneys' fees, and other costs and damages), from or through Defendants.

**SECOND CAUSE OF ACTION: RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE INTEREST (SOUTH DAKOTA POLICY)**

82. The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

83. The South Dakota Policy is controlled by and subject to South Dakota law, including because the South Dakota Policy was applied for, issued for delivery, and delivered to the trustee of the South Dakota Trust in South Dakota. S.D.C.L. § 58-10-5.

15

84. The South Dakota insurable interest statute provides, among other things, that "no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured." S.D.C.L. § 58-10-3.

85. Where an insurance company pays the death benefit on a policy lacking insurable interest, the "executor or administrator" of the insured is entitled to recover such benefits from the beneficiary, assignee, or payee that received the benefits. S.D.C.L. § 58-10-5.

86. The South Dakota Policy at issue in this case was procured or caused to be procured without insurable interest as a wager on Frank Garrett's life using United's purported STOLI scheme.

87. Regardless of whether Frank Garrett knew the details of this scheme or his identity was merely used as an instrumentality to procure the South Dakota Policy, as set forth above, stranger investors were wagering on the life of Frank Garrett and hoping to trigger a secondary market cash-in on the South Dakota Policy's death benefit.

88. The South Dakota Policy's death benefit was paid, transferred, or otherwise assigned to Defendants, their principals or agents, or others working in concert with them.

89. As a consequence, the Estate is entitled to recover the South Dakota Policy's death benefit proceeds, which are believed to exceed $10 million (plus applicable interest, attorneys' fees, and other costs and damages), from or through Defendants.

## THIRD CAUSE OF ACTION: VICARIOUS LIABILITY

90. The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

91. ITM was, at all times relevant to this matter, the agent of one or more of the Investor Defendants.

92. The above-described acts of ITM were committed while acting as an actual and/or apparent agent, representative, or contractor of one or more of the Investor Defendants.

93. The above-described acts of ITM were committed within the scope of their actual and/or apparent agency while performing services for and/or furthering the business interests of one or more of the Investor Defendants.

94. Among other things, upon information and belief, ITM, on behalf of and at the direction of one or more of the Investor Defendants, facilitated the submission of the death claim to the insurance carriers and received the Policies' death benefits.

95. As principal(s) for ITM, one or more of the Investor Defendants is/are responsible for all of the acts and/or omissions committed by ITM.

96. As a consequence, the Estate is entitled to recover (a) the South Dakota Policy's death benefit proceeds, which are believed to exceed $10 million (plus applicable interest, attorneys' fees, and other costs and damages), and (b) the Delaware Policy's death benefit proceeds, which are believed to exceed $10 million (plus applicable interest, attorneys' fees, and other costs and damages), from or through Defendants.

Dated:  January 18, 2022    COZEN O'CONNOR

*/s/ Andrew M. Hutchison*
Andrew M. Hutchison (SBN 289315)
Gregory J. Star (*pro hac vice forthcoming*)
Charles J. Vinicombe (*pro hac vice forthcoming*)
Michael J. Broadbent (*pro hac vice forthcoming*)
Chase A. Howard (*pro hac vice forthcoming*)

*Attorneys for Plaintiff*

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated: January 18, 2022        COZEN O'CONNOR

*/s/ Andrew M. Hutchison*
Andrew M. Hutchison (SBN 289315)
Gregory J. Star (*pro hac vice forthcoming*)
Charles J. Vinicombe (*pro hac vice forthcoming*)
Michael J. Broadbent (*pro hac vice forthcoming*)
Chase A. Howard (*pro hac vice forthcoming*)

*Attorneys for Plaintiff*

COZEN O'CONNOR
101 MONTGOMERY ST, SUITE 1400
SAN FRANCISCO, CA 94104